580

(266 P.3d 549)
No. 104,441

JAMES BAGGETT, *et al.*, *Appellants*, v. THE BOARD OF COUNTY COMMISSIONERS OF DOUGLAS COUNTY, KANSAS, *Appellee*, and MASTERCRAFT CORPORATION, A Kansas Corporation, and CITY OF LAWRENCE, KANSAS, *Intervenors/Appellees*.

Opinion filed September 30, 2011.

*Ronald Schneider*, of Ronald Schneider, P.A., of Lawrence, for appellants.

*Evan H. Ice* and *Laura E. Seaton*, of Stevens & Brand, L.L.P., of Lawrence, for appellee Board of Douglas County Commissioners.

*Michael M. Shultz*, of Kaup & Shultz, Attorneys at Law, LC, of Lawrence, for intervenor/appellee City of Lawrence.

Before GREENE, C.J., MARQUARDT and STANDRIDGE, JJ.

GREENE, C.J.: James Baggett and a group of similarly situated individual landowners (Baggett Group) appeal the district court's decision to affirm the approval by the Board of Douglas County Commissioners (Board) of an island annexation of property to the City of Lawrence (City). The Baggett Group argues the district court erred by permitting the intervention of the developer of the property to be annexed and by failing to enforce certain discovery against that intervenor. They also challenge the Board's decision as arbitrary, capricious, and unlawful, as unsupported by substan-

tial competent evidence, and as contaminated by procedural error and ex parte communications. Concluding that the Board's decision is not adequately supported by evidence in the record, we reverse the district court's decision affirming the Board's annexation approval and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 30, 2008, the business owners (the applicants) of approximately155 acres of land (the property) in Douglas County (the County) petitioned the City for the voluntary annexation of the property, which lies northwest of the Lawrence city limits, immediately north of the intersection of K-10 and the Farmer's Turnpike, near the Lecompton interchange of the Kansas Turnpike, later seeking rezoning for industrial development. The property does not adjoin the contiguous boundaries of the City, and therefore the proposed annexation constitutes an island annexation pursuant to K.S.A. 12-520c. Before the annexation request, the property was undeveloped agricultural property used as pastureland and was zoned County A (Agricultural).

The Baggett Group consists of individual homeowners adjacent to or located within ½ mile of the property. Their property is zoned County A, with rural residential homes located along the existing county roads. Mastercraft Corporation, which successfully intervened in the proceeding in district court, is the developer of the property and has pursued the annexation and zoning in question on behalf of the applicants.

Among the initial actions reflected in the record, a staff report to the City Planning Commission recommended that annexation be deferred until a sector plan could be completed. Its report pointed out that sanitary sewer services, water services, and private utilities were needed for the property, and that a regional detention plan for each watershed on the property was needed but not yet developed. Finally, the report noted that the property was outside the existing service response districts.

On March 26, 2008, despite this strong recommendation from its staff, the City Planning Commission recommended annexation to the City Commission on a 6-2 vote. On April 15, 2008, pursuant

to K.S.A. 12-520c, the City adopted Resolution No. 6764 (City Resolution) requesting that the Board find and determine that the annexation of the described property into the City would not hinder or prevent the proper growth and development of the area or that of any other incorporated city located within the County.

On May 14, 2008, the Board met in regular session to consider the City Resolution. After presentation by the Lawrence-Douglas County Metropolitan Planning Commission staff, the issue was opened for public comment, and many witnesses spoke either for or against the annexation. Jane Eldredge and Matthew Gough represented the applicants and Mastercraft, and Eldredge stated that annexation was sought by the owners: (1) to bring the property under the jurisdiction of the City and thereby regulate the development more stringently to protect the neighbors; (2) to provide for much needed industrial space for the long-term growth of the County; and (3) to provide more jobs and more tax revenue.

Ron Schneider, the attorney for the Baggett Group, stated that island annexations are rare. He argued that Eldredge had glossed over the critical determination to be made by the Board, stating, "Your determination is not whether or not this is a good zoning or bad zoning. It's precisely K.S.A. 12-520c, whether or not this will hinder or prevent the proper growth and development of the area or that of any other incorporated city located within such county." He asked that the Board refrain from making a decision due to the present lack of adequate water or sewage. He also emphasized that the Board was unaware of what type of development was going to occur on the property.

Eldredge responded that she was unable to be specific as to the intended use of the property, only that it will be within the permissible uses under the industrial zoning classifications. Indeed, the applicants' initial letter to the Board had stated that "[t]he proposed uses of the Property are . . . limited to those uses permitted *within industrial zoning classifications* by the City." (Emphasis added). Although there was discussion about a distribution center of 100,000 to 500,000 square feet, Eldredge warned that "we're not talking about probably a single use on this site."

On May 21, 2008, the Board adopted Resolution No. 08-18 by a 2 to 1 vote, finding that the proposed annexation should be approved. In its findings, relevant to the proposed use, the Board stated:

"h. The reason for the proposed annexation is to construct an industrial park, which will help mitigate the shortage of available industrial space.

"i. The owners of the Property, as developers, cannot reasonably identify the specific uses within the future industrial park, as such uses will be dictated by the demands of future businesses that elect to purchase or lease all or some portion of the Property; however, they do anticipate an initial warehouse distribution.

"j. The potential future uses of the Property *may include all uses permitted within the industrial zoning classifications and the Development Code of the City.*

"k. The use of the Property as an industrial park does not conflict with any other established development plan for the area." (Emphasis added.)

The Board concluded that the proposed annexation would not hinder or prevent proper growth and development of the area.

The Baggett Group appealed to the district court, which affirmed the Board's annexation decision. The Baggett Group appeals that decision.

## WAS THE BOARD'S DECISION UNSUPPORTED BY SUFFICIENT EVIDENCE OR OTHERWISE ARBITRARY, CAPRICIOUS, AND UNREASONABLE?

*Standards of Review*

The Baggett Group argues that the Board's annexation decision cannot be supported by substantial evidence and is otherwise arbitrary, capricious, and unreasonable. Our standard of review requires us to first determine whether the district court observed the requirements placed upon it and then conduct a similar review of the Board's action. *City of Topeka v. Board of Shawnee County Comm'rs*, 252 Kan. 432, 434, 845 P.2d 663 (1993). In considering such quasi-judicial decision making, we must determine whether, as a matter of law, the Board: (1) acted fraudulently, arbitrarily, or capriciously; (2) issued an order supported by substantial evidence; and (3) acted within the scope of its authority. 252 Kan. 432, Syl. ¶ 1. The appellate court "should not substitute [its] judgment for that of the members of the [Board] 'who act as elected representatives and are able to observe and hear those who testify.' [The

appellate court's] role in annexation decisions is limited. 252 Kan. at 439." *In re Petition of City of Kansas City for Annexation of Land*, 253 Kan. 402, 403-04, 856 P.2d 144 (1993). Our Supreme Court has held that "the determination of whether a board acted arbitrarily or capriciously depends 'entirely on whether the Board's conclusion on manifest injury was based upon substantial evidence.' " *Petition of City of Kansas City*, 253 Kan. at 408. Because the manifest injury judicial finding is analogous to a finding that annexation will not hinder proper growth, the question of whether annexation hinders proper growth similarly depends entirely on whether the Board's conclusion on this issue was based on substantial evidence. See *Cedar Creek Properties, Inc. v. Board of Johnson County Comm'rs*, 249 Kan. 149, Syl. ¶ 2, 815 P.2d 492 (1991).

The Board issued its decision on May 21, 2008, before the amendments to K.S.A. 2010 Supp. 77-621 became effective on July 1, 2009. Because the agency finding in this case was made before the 2009 amendments became effective, we apply the standard of review under K.S.A. 77-621(c)(7), which was in effect when the Board issued its resolution. See *Redd v. Kansas Truck Center*, 291 Kan. 176, 177, 239 P.3d 66 (2010). Thus, we review the agency's determination for evidence "that is substantial when viewed in light of the record as a whole." K.S.A. 77-621(c)(7). In Kansas, substantial evidence to support a quasi-judicial finding is defined as

"evidence which possesses both relevance and substance, and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. [Citation omitted.] . . . . [The court noted that] [i]t is not the function of an appellate court to reweigh the evidence; we are concerned only with the evidence which supports the findings below, and not the evidence which might have supported contrary conclusions. [Citation omitted.] . . . If there is substantial evidence in the record supporting the Board's determination of manifest injury, that decision must be affirmed and . . . annexation stricken down." *In re Petition of City of Shawnee for Annexation of Land*, 236 Kan. 1, 21, 687 P.2d 603 (1984).

See *Jones v. Kansas State University*, 279 Kan. 128, Syl. ¶ 5, 106 P.3d 10 (2005); *City of Topeka*, 252 Kan. at 440.

*Overview of Island Annexation Law*

K.S.A. 12-520c governs island annexations and provides, in relevant part:

"(a) The governing body of any city may by ordinance annex land not adjoining the city if the following conditions exist:
(1) The land is located within the same county as such city;
(2) The owner or owners of the land petition for or consent in writing to the annexation of such land; and
(3) The board of county commissioners of the county *find and determine that the annexation of such land will not hinder or prevent the proper growth and development of the area or that of any other incorporated city located within such county.*" (Emphasis added.)

"A finding that annexation will not hinder proper growth is more than just a legislative decision that annexation is advisable. It is analogous to finding that annexation will not cause manifest injury, which is a judicial finding." *Cedar Creek Properties*, 249 Kan. 149, Syl. ¶ 2.

The Baggett Group argues that K.S.A. 12-521, the alternate annexation procedure requiring county commission approval, see 249 Kan. at 155, and particularly the listed criteria for manifest injury therein "are clearly of value for the Board of County Commissioners and this Court for determining what is relevant, and what should be considered to determine if a proposed island annexation will hinder or prevent proper growth and development." We disagree. K.S.A. 12-521 has application to specific categories of proposed annexation that are not at issue here. The statute sets forth a different procedure with separate requirements from K.S.A. 12-520c, which relates specifically to island annexations such as the one proposed here. See Parnacott, *Annexation in Kansas*, 70 J.K.B.A. 28, 30-33 (Nov./Dec. 2001).

*Analysis of the Evidence*

We begin our review of the evidence by analyzing the staff report to the City Planning Commission. The Baggett Group urges us to consider this evidence as "the most important source of information for the [Board] to consider." Our Supreme Court has admonished that the ultimate authority in such matters is the elected

officials, not an appointed advisory commission. *Manly v. City of Shawnee*, 287 Kan. 63, 70-71, 194 P.3d 1 (2008). Nevertheless, we find the staff report to contain virtually undisputed evidence regarding the property characteristics and other considerations that served to focus the debate before both the City Commission and the Board. The report's references to current development plans for the area are of particular interest because those plans must surely be a key factor in deciding whether the proposed annexation would "hinder or prevent the proper growth and development of the area."

First, the report notes that the annexation request "is not consistent with" the growth management policies found in "Horizon 2020," the City's formal planning policy statement, which is referred to "as the primary tool for ensuring timely and orderly growth." The property "lies outside of the designated Urban Growth Area" and had not been planned to support urban densities of development during the planning period. The report also notes that the proposed annexation request was inconsistent with the recommendations for annexation reflected in the formal planning policy document. The report concludes with a statement that any development in this area should include "a plan [to] be tied directly to specific uses for development to mitigate harm to the surrounding area and to assure that adequate provisions are provided for integrating the development into the ultimate system when appropriate."

The relative importance of the City's formal plan for development was best stated by one member of the Baggett Group, who wrote to the Board prior to the open hearing and stated in material part:

"I am not writing to insist that this property should not be annexed or rezoned. I am writing to insist that the city and county operate per statute (K.S.A. 12-747), policy (Horizon 2020) and precedent (Joint City County Ordinance No. 8218). As a property owner within a 1000 feet of the property to be discussed . . . I made an investment based on the City/County Comprehensive plan which stated that this area would not be in line for development for another 10 to 15 years. [That] Plan states:

'The Comprehensive Plan provides a vision for the community. It is used as a policy guide that identifies the community's goals for directing future

land use decisions. The Plan is also used by property owners to identify where and how development should occur; by residents to understand what the city and county anticipates for future land uses within the community; and by the city, county and other public agencies to plan for future improvement to serve the growing population of the community.

' . . . The Comprehensive Plan is used most often as a tool to assist the community's decision makers in evaluating the appropriateness of land development proposals.' "

The concern that "specific uses" be designated for consideration of the statutory criteria is a theme of the appellants on appeal. The Baggett Group argues that because there were no specific uses indicated for the proposed land—other than "within industrial zoning classifications"—the Board failed to consider how those broad uses would affect the existing uses in the area surrounding the land to be annexed. As referenced in our factual summary above, there was mention of some intentions for an industrial park, but Eldredge repeatedly warned that the proposed uses could only be identified as "within the industrial zoning classifications." As we have noted above, the applicants' initial letter to the Board stated that proposed uses were to be with all industrial zoning classifications and could not be further specified:

"The Property will be used for industrial purposes, but the exact uses can not be identified at this time. In *Cedar Creek*, the Court stated that 'in almost every case where there has been a request for island annexation, there will be a proposed use.' 249 Kan. at 158. In this case, unlike *Cedar Creek*, the Applicant is a developer, not an end-user of the Property. The specific uses that will occur on the subject property will be dictated by the demands of employers that are interested in the site (and further subject to applicable zoning, subdivision and other use restrictions)."

Those industrial classifications for the City include "industrial/business park district (IBP)," "limited industrial district (IL)," and "general industrial district purpose (IG)." Of greatest concern to the landowners are the potential uses that would be permitted under the IG classification, as they include uses "that would create any of the commonly recognized nuisance conditions or characteristics" including continuous, frequent, or repetitive noises or vibrations; noxious or toxic fumes, odors, or emissions; electrical disturbances; or night illumination into residential areas. Examples of

permissible activities within the IG classification include explosive storage (including blasting operations) and intensive industrial usages such as ready mix operations. The classification standard for IG zoning includes a statement that "[t]he district is generally incompatible with residential areas and low-intensity commercial areas."

The evidence reflects that there are as many as 11 homes directly adjacent to the proposed area of annexation and 63 homes are located within ¾ of a mile from that area. The area is primarily composed of residential and agricultural use. In fact, the record indicates that the area to be annexed was currently zoned agricultural and 40% of that acreage was designated as "prime farmland." These characteristics of the existing properties within, adjacent to, and near the proposed acreage are not disputed within the record.

Numerous witnesses appeared before the Board, and some of them noted that the impact of the annexation was impossible to determine without knowing more about the intended usage of the land. One such witness challenging the annexation stated that part of the problem is that "we don't know what their [sic] suggesting." Another witness noted that it was difficult if not impossible to assess impact without knowing more about usage:

"Not only would that harm existing residents, but it seems to me inconceivable that anyone else would ever build out there. Any kind of property whether it was residential, commercial or industrial absent some assurance that they wouldn't have to undergo water rationing. Now, in fact, we cannot say water rationing is inevitable. And the reason we can't say that is we don't know what's going in there. . . . [H]ow can the commission make a finding that this annexation will not hinder or prevent the proper growth and development of the area without knowing specifically what the water usage, at least in the ball park area, might be when the city has stated this is a[n] island annexation, they have an interim utility plan which would in fact require our WD6 [Rural Water District No. 6] to have some uh input here."

The attorney for the Baggett Group stated to the Board:

"[Y]ou have a right to know on annexation . . . what is the proposed use and what is the reason. . . I think you must demand to know what the use is. And if not, you have the responsibility to make a finding you can't determine whether or not it will harm or adversely affect the nearby property."

## Analysis of the Board's Decision

The Board's decision acknowledges that the potential future uses of the property "may include all uses permitted within the industrial zoning classifications and the Development Code of the City." Despite this rather broad finding, the record is silent on any consideration by the Board of the impact on the current area of those more potentially deleterious uses that would be permitted under the IG zoning classification.

In *Cedar Creek Properties*, our Supreme Court faced a situation where Johnson County precluded evidence of the intended usage of the proposed acreage. In reversing the board of county commissioners, the court noted the critical need for the board to know of the intended usage in order to perform its function.

"[S]hould the BOCC consider the proposed land use? Defendants argue that the answer is no, because this would usurp the function of the city zoning authority, and that plaintiff's remedy lies with the city. This is unpersuasive. The city officials making the decision on how to zone the land do not represent the residents in outlying areas. For the residents of outlying areas to have a voice in the land use, there must be some initial consideration by the BOCC.

"The proposed use or the reason for the requested annexation must be considered by the BOCC because the use of reason for annexation will affect the future growth of the area. In almost every case where there has been a request for island annexation, there will be a proposed use.

. . . .

"The BOCC's refusal to consider land use was contrary to the legislative intent and purpose of K.S.A. 12-520c . . . ." *Cedar Creek Properties*, 249 Kan. at 158, 160.

Here, we have a variation on these facts; the Board did not refuse evidence on the proposed uses for the property to be annexed, but rather the developer specified only a broad category of proposed uses—all of which do not appear to have been considered by the Board. We see in the record no indication that the Board considered, discussed, made findings, or entered conclusions on the question whether the uses of the property for activities "incompatible with residential areas" would hinder or prevent proper development of the area. In fact, one might conclude that the potential uses predesignated by formal zoning classification as incompatible with residential areas would hinder or prevent proper development

as a matter of logic. If the proposed uses include those uses that are *incompatible* with residential areas, and the existing uses include residential areas both adjacent to and near the property, would not the annexation hinder development? If the proposed uses include uses that would create commonly recognized nuisance conditions, would not the annexation acreage be precluded from proper development? (*E.g.*, who would place their business park next to such nuisances?) At a minimum, would we not expect the Board to have considered how such uses could somehow be made compatible by accommodation, restrictions, placement, or otherwise? No such discussion or findings can be found in the record.

We also note the complete absence of any record evidence suggesting that the most deleterious of the permitted IG uses would *not* hinder proper development. Despite the persistent protestations of some witnesses that the intended uses for the property were critical to the Board's decision and that the potential impact could not be assessed without more specificity, we find no evidence to support a finding that *any* use that might be permitted by the various industrial zoning classifications would not "hinder or prevent" proper growth and development of this agricultural/residential area. None.

In other words, for the Board to approve the annexation by a mere conclusory finding without a more careful and deliberative consideration of the extent that any of the proposed uses might hinder proper development of the area under consideration is both unsupported by this record and inherently arbitrary and capricious. We do not substitute our judgment for the Board, but rather conclude that, with all due respect, the Board failed to perform its function under the law. Where the developer of land in an island annexation cannot specify the intended uses of the land but provides only a category of potential uses, the Board must examine those potential uses—or at least the most potentially deleterious uses—and determine whether those potentially deleterious uses would "hinder or prevent the proper growth and development of the area." Failing in that examination, the annexation cannot survive judicial scrutiny under K.S.A. 12-520c. We are compelled to reverse the district court's order affirming the annexation of the

Board and to remand for further proceedings consistent with this opinion.

The Baggett Group has made additional claims of error on appeal, but our conclusion above renders the balance of such claims moot.

Reversed and remanded.